# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 CR 894 | **DATE** | 11/5/2003 |
| **CASE TITLE** | USA vs. Sriram | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated in the attached memorandum opinion and order, the defendant's motion for downward departure is denied [154-1]. The Probation Department is ordered to prepare a revised pre-sentence investigation report by 11/24/03. Status hearing to set the sentencing hearing is set for 11/25/03 at 9:00 a.m. Defendant's presence is waived for the status hearing. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | | Document Number |
|---|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | | |
| | No notices required. | | | number of notices | | |
| | Notices mailed by judge's staff. | | | | | |
| | Notified counsel by telephone. | | | NOV 06 2003 | | |
| ✓ | Docketing to mail notices. | | | date docketed | | |
| | Mail AO 450 form. | | | | | |
| | Copy to judge/magistrate judge. | | | docketing deputy initials | | |
| MF | courtroom deputy's initials | | U.S. DISTRICT COURT 03 NOV -5 PM 2:25 | date mailed notice | | |
| | | | Date/time received in central Clerk's Office | mailing deputy initials | | |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **No. 00 CR 0894** |
| v. | ) | |
| | ) | **Judge John W. Darrah** |
| KRISHNASWAMI SRIRAM, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

On January 10, 2002, the Special May 2001 Grand Jury for the Northern District of Illinois

returned a 64-count second superseding indictment against Dr. Krishnaswami Sriram. Dr. Sriram

was charged with violations of 18 U.S.C. §§ 2, 287, 1341 and 1347, and 26 U.S.C. § 7206(1). The

indictment also contained a forfeiture allegation.

Dr. Sriram pled guilty to Counts 5, 20, and 63 of the second superseding indictment. Count

5 charged Dr. Sriram with mail fraud in violation of 18 U.S.C. §§ 2 and 1341. Count 20 charged

Dr. Sriram with health care fraud for defrauding health care benefit programs, including Medicare,

Medicaid, and private insurance, in violation of 18 U.S.C. §§ 2 and 1341. Count 63 charged

Dr. Sriram with tax fraud in violation of 26 U.S.C. § 7206(1). Dr. Sriram also pled guilty as to the

basis for, *but not the amount of,* the forfeiture allegation. (Emphasis added). It is important to note

the exact conduct admitted by Dr. Sriram by his guilty pleas.

Dr Sriram specifically admitted that:

### [Count 5]

> [b]eginning no later than January 1996, and continuing until at least
> March 2001, at Lake Forest and Chicago, defendant Krishnaswami
> Sriram ("Sriram") devised and intended to devise, and participated in

a scheme and artifice to defraud and to obtain money and property from Medicare, Medicaid and other private medical insurance plans by means of materially false and fraudulent pretenses, representations and promises, and by means of material omissions. and to fraudulently deprive certain patients of the intangible right of honest services, which scheme is further described below.

Defendant Sriram and Home Doctors knowingly took the following actions:

... billed insurers for certain tests, services and procedures which were not performed.

... created false records and made false entries in certain records, including medical records and business records.

... did not bill insurance co-payments and deductibles for certain patients.

... submitted false and fraudulent claims to insurers that resulted in substantial payments to defendant Sriram and Home Doctors.

Defendant Sriram and Home Doctors knowingly submitted false and fraudulent claims for services that were not actually provided, which included the following:

a. Claims that defendant Sriram had provided services to certain patients after the patients died, when, in fact, he had not provided such services to the patients after they died;

b. Claims that defendant Sriram provided services, including examinations and treatment, to certain patients in hospitals and nursing homes, when in fact no such services had been provided to such patients;

c. Claims that defendant Sriram had examined and treated patients on certain dates, when, in fact, defendant Sriram was not in the United States on the specified dates;

d. Claims that reflected that defendant Sriram had worked in excess of 25 hours per day on certain days, based on CPT codes used, when, in fact, he had not worked that many hours during the particular time period;

e. Claims that defendant Sriram had provided services to more than 100 patients per day, on certain days, when, in fact, he had not provided services to that many patients on those days;

f. Claims that defendant Sriram provided services to the same patient at two different hospitals on the same date, when, in fact, he had not provided services to the same patient at two different hospitals on the same date;

g. Claims that defendant Sriram had performed certain tests, including pulse oximeter tests, even though such tests had not been

performed; and

h. Claims that doctors working for Home Doctors had provided various services and tests, which had not been provided, including claims for services provided by doctors who were not working for Home Doctors on the relevant dates of service.

After defendant Sriram performed cardiac catherizations and other angiographic tests, defendant Sriram falsified certain entries made in records concerning the performance and results of cardiac caths and other angiographic studies.

Sriram and his company Home Doctors caused Medicare, Medicaid and certain private medical insurance plans to issue checks to defendant Sriram, Home Doctors, Edgewater Hospital, and other individuals and entities, for services, procedures and testing that were not provided.

Sriram attempted to justify and support the false and fraudulent claims that he submitted, and attempted to conceal his false representations and fraudulent billing by taking the following actions: creating false and fraudulent records, including false medical records and false bills; and preparing the computer generated History and Physical forms contained in the medical charts in the blue binders that were obtained by the government by seizure or subpoena.

Sriram knowingly made false entries in certain records, including making false entries in cardiac cath reports, falsifying test results, recording false diagnoses, and making false entries in progress notes.

Sriram contacted Medicare beneficiaries who had complained to Medicare about defendant Sriram and his billing practices and asked those Medicare beneficiaries to stop their complaints.

Sriram did misrepresent, conceal, hide and cause to be misrepresented, concealed, and hidden, the purpose of and acts done in furtherance of the fraud scheme.

Sriram executed and attempted to execute the scheme described above by causing various things, including money in the form of checks, to be sent through the mail and by interstate wires.

Specifically, on or about January 10, 2000, at Lake Forest and Chicago, Sriram, for the purpose of executing the above-described scheme, and attempting to do so, did knowingly cause an envelope to be delivered by mail ... which envelope contained a check from Wisconsin Physicians Service, a Medicare contractor, made payable to Home Doctors, which included payment for Medicare in the approximate amount of $617, relating to patient Lillie Jones, who did not receive the services, in whole or in part, for which defendant Sriram billed and was paid, in violation of Title 18, United States

3

Code, Section 1341.

### [Count 20]

Beginning no later than September 1996, and continuing until at least March 2001, at Lake Forest and Chicago, defendant Sriram did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud health care benefit programs, including Medicare, Medicaid, and private medical insurance plans, which affected interstate commerce, and to obtain money and property owned by and under the custody and control of such health care benefit programs by means of materially false and fraudulent pretenses, representations, promises, and by means of material omissions, all in connection with the delivery of and payment for health care benefits, items and services.

On or about January 13, 2000, at Lake Forest and Chicago, defendant Sriram did knowingly and willfully execute and attempt to execute the above described scheme to defraud health care benefit programs, by causing Medicare to issue a check containing the amount of approximately $641 to pay for services that were not provided, in whole or in part to the patient Ernest Norago, in violation of Title 18, United States Code, Section 1347.

### [Count 63]

On or about April 15, 2000, ... Sriram ... willfully did make and subscribe, and cause to be made and subscribed, a joint United States Individual Income Tax Return ... on behalf of himself and his wife, which return was verified by a written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service, and which return he did not believe to be true and accurate as to every material matter [including]...

a. ... he had substantially overstated his total business expenses;

b. ... he substantially understated his profit from business;

c. ... return stated that defendant's Business income was $216,110, when in truth and in fact, as defendant well knew, his business income substantially exceeded that amount;

In violation of Title 26, United States Code, Section 7206(1).

Following the Court's acceptance of the guilty pleas and the finding of guilty and entering of judgment thereon, the case was continued for sentencing. A presentence investigation was

conducted, and a report was prepared by the probation office. The Government and Dr. Sriram submitted objections thereto pursuant to Rule 32.

The parties dispute the computation of the offense level of the underlying fraud offenses of Counts 5 and 20. As to the fraud offenses, the Government computes the total adjusted level offense of 36. Sriram argues that the total adjusted level offense is 7.[1] The Government seeks to add fifteen additional points to the base offense level of the fraud counts, claiming an intended loss of more than $10,000,000 and less than $20,000,000. Sriram argues that the Government only established a loss of $1,258.04.

Sriram also contests sentencing enhancements based on mass marketing, sophisticated means to conceal the offense, reckless risk of injury, vulnerable victim, a large number of vulnerable victims, leader/organizer, obstruction of justice, and acceptance of responsibility. Sriram also seeks a downward departure, arguing this case falls outside the "heartland" of typical cases to which the Guidelines were intended to apply.

Generally, the court is entitled to rely on the presentence investigation report ("PSR") in ruling on factual issues in the sentencing context so long as the PSR is based upon sufficiently reliable information. *USA v. Willis*, 300 F.3d 803, 807 (7th Cir. 2002) (*Willis*). A defendant cannot show that a PSR is inaccurate by simply denying the PSR's truth; rather, the defendant must produce some evidence that calls the reliability or correctness of the alleged facts into question. If the defendant offers no more than a bare denial, the court is entitled to rely entirely on the PSR. *Willis*, 300 F.3d at 807.

---

[1]The parties agree that the base offense level for Count 63 is 18. Accordingly, Count 63 is not addressed in this Order.

In this case, an evidentiary hearing on Dr. Sriram's sentence was held. The sentencing hearing consisted of testimony over a 3-month period by 19 witnesses, including 7 expert witnesses, and included the submission of more than 300 exhibits. Following the hearing, the parties submitted over 350 pages of argument in post-hearing memoranda and responses.

The government bears the burden to prove the facts supporting a sentence by a preponderance of the evidence. *USA v. Noble*, 246 F.3d 946, 951 (7th Cir. 2001) (*Noble*). The defendant bears the burden of proof when seeking a downward departure, and the judge may disbelieve the defendant's position without requiring additional evidence. *USA v. Chavez-Chavez*, 213 F.3d 420, 422 (7th Cir. 2000).

The Sentencing Guidelines provide that, during sentencing, "the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy". U.S.S.G. 6A1.3(a); *USA v. Polson*, 285 F.3d 563, 566 (7th Cir. 2002) (*Polson*).

The Federal Rules of Evidence do not apply at sentencing. *See Noble*, 246 F.3d at 953. A sentencing court is entitled to consider a broad range of information in the sentencing process. However, due process requires that the court afford the defendant a meaningful opportunity to rebut contested evidence. *USA v. Polson*, 285 F.3d at 567. When the evidence submitted by the prosecution at trial contains "sufficient indicia of reliability," the defendant must come forward with some evidence other than an unsupported denial to establish its inaccuracy. *Polson*, 285 F.3d at 567. Uncorroborated evidence can be a sufficient basis for a sentence. *Noble*, 246 F.3d at 951.

*Base Level*

The base offense level for violation of 18 U.S.C. §§ 1341, 1347 and 2, is six.

U.S.S.G. § 2F1.1(a).

*Amount of Loss*

The base offense level may be increased based on the amount of loss. If the loss is $5,000 or less, there is no increase in the base level. For loss greater than $5,000, the base level is increased based on the amount of loss through 18 levels of varying increments up to $80,000,000. U.S.S.G. § 2F1.1(b)(1). In order to establish the appropriate range, the court is required to determine the amount of loss attributable to the fraudulent scheme. If the intended loss by the defendant can be determined, such figure is used even if it is greater than the actual loss. *See United States v. Higgins,* 270 F.3d 1070, 1074 (7th Cir. 2001).

Note 9 of the applicable Sentencing Guidelines, 2F1.1, states:

> For the purposes of subsection (b)(1), the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information. This estimate, for example, may be based on the approximate number of victims and an estimate of the average loss to each victim, or on more general factors, such as the nature and duration of the fraud and the revenues generated by similar operations. The offender's gain from committing the fraud is an alternative estimate that ordinarily will underestimate the loss.

In his plea agreement, Sriram admits to receiving $1,258.04 from his fraudulent conduct, which results in a base offense level of 6. The Government seeks a fourteen-level increase based on its computation of loss as being more than $5,000,000 and less than $10,000,000.[2]

The Government's approach to loss calculation concluded that the loss exceeded $5 million,

---

[2]In its first sentencing memorandum filed before the sentencing hearing, the Government contended that the loss was in excess of $10 million.

using the assumption that Dr. Sriram provided face-to-face care to patients for approximately 60 to 80 hours per week. If Dr. Sriram is given credit for submitting legitimate claims for 60 hours per week of face-to-face patient care, the intended loss is approximately $8.3 million. If Dr. Sriram is given credit for submitting legitimate claims for 80 hours a week of face-to-face patient care, the intended loss is approximately $5.7 million.

The Government's methodology for determining the extent of the fraud consisted of comparing Sriram's bills with the hours that Sriram was available to provide services. The Government here bases its theory of loss on the method used in *United States v. Sidhu*, 130 F.3d 644 (7th Cir. 1997) (*Sidhu*), in which the Government compared the amount of time that the defendant was determined to be available for work with the defendant's *actual billings* and determined that the billings in excess of the time that the defendant could have been available for work were fraudulent. (Emphasis added). However, in *Sidhu*, the defendant did not challenge the Government's methodology. *See Sidhu*, 130 F.3d at 653.

Here, however, the Government's loss calculation was based on database information from Medicare and Medicaid regarding Dr. Sriram's billings. Duplicate billings, where the claims were exact duplicates, were purportedly eliminated. The Government then used the CPT code time parameters to approximate the level of activity that Dr. Sriram billed for from the time period 1995 through 2000 to determine the total.[3]

In addition to determining a loss for Dr. Sriram's personal billings, the Government

---

[3]CPT stands for current procedural terminology, which reflects a way of describing the services that a physician performs. Many of the CPT codes have "typical times" attached to them. The typical time is the time an average physician would spend with an average patient for that service. The typical times are a good approximation of the time spent for a specific service. However, such services could be done more slowly or more quickly in actuality.

calculated additional loss based on billings submitted by Dr. Sriram for his home care company, Home Doctors. To calculate this loss, the Government determined the total number of visits actually performed by dividing the total amount paid to the physicians by the mid-range amount paid to the physicians for each visit. This calculation showed a total of 2,562 visits performed by the physicians. However, Dr. Sriram billed for 6,461 visits by Home Doctors. Therefore, the Government concluded that Dr. Sriram submitted false claims for approximately 3,899 visits, or 60% of the claims submitted for Home Doctors. Sixty percent of the total claims submitted ($1.6 million) is a loss of $1,007,458.

Alvydas Jonikas, an auditor, testified for the Government that he analyzed this billing data and calculated these loss amounts using this methodology. Jonikas based his analysis on a universe of billing data obtained from Wisconsin Physician Services ("WPS") and Medicaid. However, Cathy Barbour, a special agent of the Federal Bureau of Investigation assigned to the case, admitted that WPS made fundamental mistakes in terms of the information it provided to the Government. The Government failed to present any evidence that any of the identified fundamental mistakes were accounted for in Jonikas's analysis.

Most significantly, Jonikas admitted that the universe of billing data upon which his analysis was based could include multiple duplicate claims that had been re-submitted for payment and that Dr. Sriram could have intended to bill and be paid only for a single medical service. Significantly, Jonikas and Barbour admitted only that the methodology used in this case to establish the purported over billing included neither a use of statistically valid sample of patients or a review of any medical records.

Dale Sietsema, an expert in health care finance, testified for Dr. Sriram. Sietsema has been

involved in the field of health care finance for approximately 25 years. His experience includes being Associate Vice President of Health Care Finance at Rush-Presbyterian Hospital; President of Strategic Management Partners, a consulting group involved in auditing; and the development of his own health care finance consulting business. Sietsema also holds a faculty position at Rush University in the College of Health Systems Management and has made numerous written and oral presentations involving health care finance, including Medicare and Medicaid billing.

Sietsema testified there are two methods which can be used to conduct a valid and reliable overpayment audit. First, the auditor can review each and every claim and compare all of those claims against the corresponding medical records to determine whether the claims are justified. Second, the auditor can select a statistically significant random sample of claims and compare that random sample against the corresponding medical records.[4] Sietsema testified that these are the only two methods that are accepted as reliable. Sietsema had never seen an audit for overpayment conducted on the basis of Jonikas's methodology. Sietsema concluded that the methodology used by Jonikas was completely unreliable.

Sietsema further opined that Dr. Sriram's records lacked the organization and infrastructure necessary to avoid widespread errors in medical billing; Dr. Sriram maintained incomplete and disorganized medical records, compounding the billing errors; Dr. Sriram's billing demonstrated an objective lack of technical knowledge regarding billing procedures; Dr. Sriram sometimes submitted

---

[4] In a footnote in its first Sentencing Memorandum, the Government admitted that federal agents had began to interview witnesses identified as part of a statistical sample but apparently abandoned this process. The Government contends that this was because many of the witnesses were dead, had suffered a memory loss or were very ill, without providing any specific information supporting this assertion or explaining why these events, if they occurred, would prevent a loss analysis by use of a statistically valid sample.

bills months after the medical services were performed and that he lacked an effective billing and accounting system; and that it is unreliable to use CPT time parameters to determine the amount of patient care rendered by a particular physician. In Sietsema's opinion, the Government's methodology did not prove that Dr. Sriram overbilled in the aggregate. Based on Sietsema's calculations, assuming that Dr. Sriram spent 100% of the published CPT hours for services performed, Dr. Sriram could have legitimately provided all of the services for which he billed in a time frame approximately half that of the Government's calculated daily hours that needed to be worked to support Dr. Sriram's billing. Furthermore, Dr. Sriram's practice allowed him to see many patients in a shorter time frame than that used in the Government's calculations because of the particular circumstances of Dr. Sriram's practice, *i.e.*, several patients were in the same nursing home and/or hospital.

The Government failed to prove by a preponderance of the evidence that the actual or intended loss was greater than $5,000,000 and less than $10,000,000. Nor is the information presented by the Government regarding the amount of loss sufficient to determine the amount of loss for any amount under $5,000,000. The Government has failed to show a reasonable estimate of where on the continuum, set out in Section 2F1.1(b)(1)(A) through (S), the actual or intended loss falls for purposes of applying a specific offense characteristic level increase. The flawed methodology and the data upon which it was based generally lacked sufficient indicia of reliability to support its probable accuracy. Rather, the Government's presentation on this issue invites speculation as to the amount of actual or intended loss and supports the proposition that it is as probable as not that the discrepancy the Government contends represents actual loss or intended loss from fraud is the product of the Defendant's inept record keeping and billing practices, *i.e.*, a

11

misallocation of dates of service and/or patient/physician PIN numbers for services actually rendered at a different time and/or by a different physician.

However, as set out above, Dr. Sriram made certain admissions in his plea of guilty. He admitted that he received $1,258.04 from his fraudulent conduct. The Defendant also admitted that he had examined and treated patients on certain dates, when, in fact, he was not in the United States on the specified dates. The Government has proven by a preponderance of the evidence that Dr. Sriram billed a total of $48,634.17 for services while he was not in the United States based on travel information contained in his passport and specific records. Accordingly, the Government has proven by a preponderance of the evidence a specific offense characteristic of an intended loss of $49,892.21. Based on this loss, a five-level increase in the base offense level is required. *See* 2F1.1(b)(1)(F) (loss of more than $40,000 - add five-level increase).

## More than Minimal Planning

Pursuant to U.S.S.G. § 2F1.1(b)(2)(A) and (B), if the offense involved more than minimal planning, or a scheme to defraud more than one victim, increase the offense level by two. Defendant concedes the application of this sentencing enhancement. A two-level enhancement is applicable pursuant to U.S.S.G. § 2F1.1(b)(2)(A) and (B).

## Mass Marketing

The Government seeks a two-level enhancement pursuant to U.S.S.G. § 2F1.1(b)(3) because a portion of the offense was committed through massmarketing. The basis of the Government's argument is that Dr. Sriram attended health screenings in senior citizen centers, Chicago Housing Authority buildings, and senior housing buildings in an to attempt obtain patients to further his fraudulent behavior.

12

It is undisputed that Dr. Sriram attended health screenings. However, the Government has failed to prove by a preponderance of the evidence that Dr. Sriram's attendance at the health screenings had anything to do with the commission of the fraud.

*Violation of Judicial Order*

The Government seeks a two-level enhancement pursuant to U.S.S.G. § 2F1.1(b)(4)(C) for an alleged violation of a judicial order.

On August 16, 2000, a temporary restraining order was issued and subsequently extended that prohibited Dr. Sriram from defrauding any health care benefit program and/or from obtaining, by means of a false or fraudulent representation, any money under the custody or control of any health care benefit program. On December 4, 2000, December 20, 2000, and February 6, 2001, Great West Life & Annuity received numerous claims for payment of services submitted by Dr. Sriram, all of which were dated November 20, 2000. Included in the submissions were claims for Cynthia and Daniel Runion. As to Daniel Runion, Dr. Sriram submitted claims for services on seven dates. However, Daniel Runion's records and cancelled checks for co-payments demonstrated that Dr. Sriram provided services on only two occasions.

Dr. Sriram does not dispute that the above claims were filed and that they contained false information. Dr. Sriram objects to the enhancement, arguing that: (1) the Government failed to prove that Great West Life and Annuity was a "health care benefit program", (2) the amount of money received by Dr. Sriram from the false claims was small so it did not constitute a "material" violation of a judicial order, and (3) Dr. Sriram did not have the underlying medical records to review at the time he submitted the claims because they had been seized by the Government.

Dr. Sriram's objections are without merit. The Government demonstrated by a

13

preponderance of the evidence that Great West Life & Annuity was a "health care benefit program".

Furthermore, the fact that Dr. Sriram only received approximately $1,000 for the false claims submitted does not excuse violating a court order. And if Dr. Sriram did not have the records supporting these billings, it would certainly not excuse him from submitting claims which proved to be false in violation of a court order.

### Sophisticated Means to Conceal the Offense

The Government seeks a two-level enhancement pursuant to U.S.S.G. 2F1.1(b)(6)(C) for using sophisticated means to conceal the offense based on Dr. Sriram's use of his medical expertise to carry out and conceal his scheme. The Government contends that Dr. Sriram's sophisticated means included falsifying medical records to substantiate the need for tests and procedures that Dr. Sriram performed and submitted false and fraudulent bills to Medicare, Medicaid, and other insurers.

An enhancement for use of sophisticated means is appropriate where the defendant takes steps that are more complex than those taken by the average offender. *See United States v. Kontny*, 238 F.3d 815, 816 (7th Cir. 2001). "'Sophisticated means' means especially complex or especially intricate offensive conduct." U.S.S.G. § 2F1.1(b)(6)(C), Application Note 18.

The evidence at the sentencing hearing failed to prove by a preponderance of the evidence that Dr. Sriram falsified medical records to substantiate the need for tests and procedures that he performed. Instead, the evidence demonstrated that Dr. Sriram performed tests and procedures on individuals who were ill, and that, as will be discussed below, while some physicians may have elected not to perform such tests, the decision to do so varied depending on each physician's medical judgment. Furthermore, the submission of false claims, in and of itself, cannot be said to

14

be complex or intricate offensive conduct.

*Reckless Risk of Injury*

The Government seeks a two-level enhancement pursuant to U.S.S.G. § 2F1.1(b)(7), which provides for such an enhancement if the offense involved the conscious or reckless risk of serious bodily injury. The Government argues that Dr. Sriram's performance of medically unnecessary procedures, including cardiac catherizations and angioplasties, constitutes a reckless risk of injury to the patients.

Improper medical treatment can form the basis of a reckless risk of bodily injury enhancement pursuant to the fraud guidelines. *See United States v. Vivit*, 214 F.3d 908, 921 (7th Cir. 2000).

Government witnesses, Doctors Lesch and Gheorghiade, opined, based on their standards, that several of the cardiac catherizations that Defendant had performed were unnecessary. However, the Government doctors based their opinions, *inter alia*, on the 1999 ACC/AHA Guideline for Coronary Angiography. This Guideline was not published during the time that the majority of the allegedly improper catherizations were performed by Dr. Sriram. Furthermore, the Guideline did not set forth exact standards or specific goals.

Defendant also presented evidence on this issue through Dr. Dan Fintel, a cardiology expert. His report states that the criteria for deciding when to perform this procedure is subject to differing medical opinions. Dr. Fintel also opined that each of the catherizations that Dr. Sriram performed were supported by the medical history, symptoms, test results, and/or risk factors for each patient. He also opined that the decisions by Dr. Sriram to perform such tests were not a reckless risk of serious bodily injury. In addition, the defense presented evidence, including written medical school

evaluations of Dr. Sriram by his cardiology professors, that demonstrated that Dr. Sriram's skills and judgment were poor regarding the use of catherizations and evidence that he failed his first two cardiology board examinations.

Based on the above, the Government failed to prove by a preponderance of the evidence that the tests and procedures performed by Dr. Sriram were improper medical treatment which involved reckless risk of serious bodily injury.

However, the Government also contends this enhancement is appropriate on other grounds, *i.e.*, the Defendant created a risk of serious physical injury for his patients by creating false medical records which could cause the patients to be misdiagnosed and given inappropriate medical treatment. This argument was included in the Government's response to the PSR, and it is not waived.

In his plea agreement, Dr. Sriram admitted to falsifying medical records and, thereby, creating a serious risk of injury to those patients in subsequent treatment based on the inaccurate medical history. Accordingly, a two-level enhancement is applicable.

### Victim-Related Adjustment

The Government seeks a two-level enhancement pursuant to U.S.S.G. §§ 3A1.1(b)(1) and (b)(2). Section 3A1.1(b)(1) provides for a two-level enhancement if the defendant knew that the victim of the offense was a vulnerable victim. Section 3A1.1(b)(2) provides for a two-level enhancement if the victim was vulnerable and the offense involved a large number of such victims.

There is no requirement in Section 3A1.1 that a target of the defendant's criminal activities must suffer a financial loss. *See United States v. Stewart*, 33 F.3d 764, 770 (7th Cir. 1994) (*Stewart*). "Victims" for purposes of this enhancement may include individuals that are unusually vulnerable

due to their age and/or their physical and mental condition. *See Stewart*, 33 F.3d at 771 (citing *United States v. Bachynsky*, 949 F.2d 722, 735-36 (5th Cir. 1991) (*Bachynsky*). As in the present case, the doctor in *Bachynsky* defrauded insurance companies by submitting false paperwork to such insurance companies. The elderly patients that were the subjects of the false paperwork were considered "victims" for purposes of the enhancement even though the insurance company suffered the financial loss. *Bachynsky*, 949 F.2d at 735-36. Furthermore, a victim may also be the innocent instrument of a defendant's scheme to defraud. *See Stewart*, 33 F.3d at 770-71.

It is undisputed that Dr. Sriram's patients were elderly, generally uneducated, and often of low socioeconomic status. Dr. Sriram admits, in his plea agreement, that he falsified patients' medical records and submitted false claims for these patients. These patients were the innocent instrument of Dr. Sriram's admitted scheme to defraud. Furthermore, the admissions in Dr. Sriram's plea agreement and the evidence at the sentencing hearing discussed above demonstrate by a preponderance of the evidence that there was a large number of these vulnerable victims, including billing claims for over 100 different patients for claims while Defendant was not within the United States.

### Role in the Offense

The Government seeks a four-level enhancement pursuant to U.S.S.G. § 3B1.1(a), which provides for such an enhancement if the defendant was an organizer or leader of the criminal activity that involved five or more participants or was otherwise extensive.

The Government did not prove by a preponderance of the evidence that Dr. Sriram involved five or more participants in his scheme to defraud. Nor was there a preponderance of the evidence that the scheme was otherwise extensive. While the Government argues that Dr. Sriram directed and

organized approximately sixteen other doctors and made use of innocent third parties, such as secretaries, doctors, and hospitals, there was no reliable information adduced to establish the accuracy of the Government's claims in support of this enhancement.

## Abuse of Position of Public or Private Trust

The Government seeks a two-level enhancement pursuant to U.S.S.G. § 3B1.3, which provides for such an enhancement if the defendant abused a position of public or private trust, or used special skill, in a manner that significantly facilitated the commission or concealment of the offense. Dr. Sriram does not contest the applicability of this enhancement.

## Obstruction of Justice

The Government seeks a two-level enhancement pursuant to U.S.S.G. § 3C1.1, which provides for a two-level enhancement for obstructing or impeding the administration of justice. The bases of the enhancement include: (1) Dr. Sriram asked patients to withdraw their complaints against him, (2) Dr. Sriram falsified seven cardiac catherization reports after he was aware of the investigation, (3) Dr. Sriram made false statements to the FBI, (4) Dr. Sriram asked an instructor to provide a letter stating that he did not have proficiency in medical billing, (5) Dr. Sriram made false statements to pre-trial services regarding his assets in India, and (6) Dr. Sriram directed his wife to provide false information about assets in India.

Pursuant to Section 3C1.1, a defendant's sentence may be enhanced if "the defendant willfully obstructed or impeded ... the administration of justice during the course of the investigation, prosecution, or sentencing" of the defendant. *See* U.S.S.G. § 3C1.1; *United States v. Kosmel*, 272 F.3d 501, 510 (7th Cir. 2001) (*Kosmel*).

Dr. Sriram argues that his act of contacting patients to withdraw complaints against him does

not constitute obstruction of justice because the Government failed to establish that he knew anything about the investigation when he spoke to the complaining patients. However, knowledge of an investigation is not required for a "willful" violation to occur. *See United States v. Martin*, 287 F.3d 609, 619 (7th Cir. 2002) (*Martin*). The term "willful" as used in Section 3F1.1 means "intentionally" or deliberately". Therefore, a defendant does not need to be "aware" or "know" that an investigation is underway; instead, he need only "deliberately" or "intentionally" impede or attempt to obstruct justice for the enhancement to apply. *See Martin*, 287 F.3d at 619.

In his plea agreement, Dr. Sriram admits that, as part of the scheme to defraud, he contacted Medicare beneficiaries who had complained to Medicare about him and his billing practices and asked those patients to stop their complaints. He also admits that he concealed and hid such acts in furtherance of the scheme to defraud. Based on these admissions, Dr. Sriram is found to have willfully attempted to obstruct justice.

Dr. Sriram also argues that the Government failed to prove that seven cardiac catherization reports were the result of Dr. Sriram's willful attempt to impede the investigation as opposed to the product of his simply not knowing how to accurately read cardiac catherization films. However, in his plea agreement, Dr. Sriram admits that he falsified cardiac catherization reports in an effort to hide and conceal his fraudulent scheme.

As to the alleged lies to the FBI, the Government failed to establish by a preponderance of the evidence that Dr. Sriram lied to the FBI; and the testimony offered in this regard is equivocal, at best, and the Government has failed to meet its burden.

In addition, the Government failed to prove by a preponderance of the evidence that Dr. Sriram asked an instructor to provide a letter stating that he did not have proficiency in medical

billing in an attempt to willfully obstruct or impede the administration of justice and that Dr. Sriram made false statements to pretrial services or asked his wife to provide false information to pretrial services.

Based on the above findings, the Court finds that the correct adjusted offense level subtotal for Counts 5 and 20 is 25. This subtotal is calculated based on the following:

| | |
|---|---|
| Base Offense: | 6 |
| Intended Loss: More than $40,000 | 5 |
| More than Minimal Planning | 2 |
| Violation of Judicial Order | 2 |
| Reckless Risk of Injury | 2 |
| Vulnerable Victim | 2 |
| Large Number of Vulnerable Victims | 2 |
| Abuse of Trust | 2 |
| Obstruction of Justice | 2 |
| | ——————— |
| | 25 |

*Acceptance of Responsibility*

Dr. Sriram seeks a three-point reduction for acceptance of responsibility pursuant to Section 3E1.1.

A defendant must prove his entitlement to a reduction for acceptance of responsibility. *USA v. Willis*, 300 F.3d 803, 807 (2002). The mere fact that a defendant enters into a plea agreement is insufficient to entitle the defendant to a downward departure; rather, the defendant must demonstrate

that he has actually accepted responsibility for his actions. *USA v. Taliaferro*, 211 F.3d 412, 414 (7th Cir. 2000).

Section 3E1.1(a) provides for a two-level reduction if the defendant clearly demonstrates acceptance of responsibility for his offense. Dr. Sriram has demonstrated that he has accepted responsibility for his offense.

Section 3E1.1(b) provides for an additional one-level reduction for timely notifying authorities of the defendant's intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the court to allocate its resources efficiently. The Government objects to this reduction because the notification by the Defendant of his intent to plead guilty came a week before the scheduled trial date. Dr. Sriram contends that, under the particular pretrial circumstances of this case, his notification to plead guilty was timely.

Defendant received over 24,000 pages of discovery from the Government within the 60 days preceding the trial. The discovery letters indicate that the Government had much of this discovery long before it was provided to the Defendant. For example, the July 16, 2002 discovery letter establishes a seven-month delay in the Government's providing discovery from its date of receipt by the Government. The September 4, 2002 discovery letter indicates that the production of materials received by the Government as early as March 1999 did not occur until September 4, 2002.

Timely production of discovery was essential for adequate preparation by the defense. The indictment contained sixty-four counts; and the evidence regarding the issues raised in those counts necessarily analyzed and assessed by competent defense counsel was, to say the least, voluminous

and extremely complex.[5]

These circumstances, including discovery violations and the late production of discovery by the Government, were reasonably related to the timing of the defense's decision to accept a plea agreement. Under these circumstances, the notification by the Defendant of his intention to plead guilty was timely.

*Motion for Downward Departure*

Lastly, Dr. Sriram seeks a downward departure, arguing that his case falls outside the "heartland" of typical cases to which the Guidelines were intended to apply. *See Koon v. United States*, 518 U.S. 81, 94 (1996). Dr. Sriram contends that such a downward departure is appropriate because he possessed a "noble" devotion to the care of his patients, he kept significant funds in a bank to satisfy any tax claims, and because Dr. Sriram devoted himself to sick, elderly, and minority patients. Dr. Sriram's admissions in his plea agreement to conduct, including admitting to creating and falsifying medical records, submitting false and fraudulent claims, claiming to provide medical services when no such services were rendered, does not support his contention that this case falls outside the heartland of typical cases by a preponderance of the evidence. Accordingly, the Defendant's Motion for a Downward Departure is denied.

---

[5]The Government also produced some of its expert materials late. For example, the disclosure of Dr. Joseph Meeser did not occur until late August 2002. Dr Meeser's late disclosure required additional time and effort by the defense. This witness was disclosed after information was obtained through the efforts of the defense which discredited the credibility of another Government expert, Dr. Michael Lesch.

For the foregoing reasons, the adjusted offense level for Counts 5 and 20 is 25. This adjusted offense level is greater than the adjusted offense level of 18 for Count 63. Accordingly, the combined adjusted offense level is 25. This is adjusted downward three levels for acceptance of responsibility. The total offense level is 22.

Dated: _November 5, 2003_

_____
JOHN W. DARRAH
United States District Judge